McIlvaine, J.
The only question in this case is the location of the boundary line between sections one and two, in townsliip six, north, of range one, east. This lino, where-ever found, is common to both sections, and must determine the controversy between these parties. The section corners on the exterior lines of this township were established in the year 1820, by a survey by deputy surveyer Carpenter, duly made and approved before the lands were put into market. These corners have been and still are readily ascertained from Carpenter’s field notes. A straight lino drawn from one of these corners, found on the north line of the township and common to sections one and two on the north, to a corresponding corner on the south line of the township, common to sections 35 and 36, will locate this line as it was claimed by the plaintiff below. The line thus ascertained must prevail, unless the testimony shows that this section line was located and established elsewhere.
The defendant below claims that the line in controversy is situated 10.05 chains west of the line above described and parallel with it.
The description of -this boundary line, as contained in the plaintiff’s deed, and in all the muniments of his title, is simply the section line. No other calls are made and no other description given. And the same is true of the defendant’s title papers. We take it, therefore, that the burden of showing that the actual location of this line has *272 been made at a place other than where it should have been located, devolves upon the defendant, who makes the claim.
It appears from the agreed statement of facts, that- in the year 1821, one John Lowrie was employed by the surveyor general of the district to sub-divide this township into sections, &c. That afterwards he (Lowrie) made a return to the office of the surveyor general of the district, of what purported to be the field notes of his survey and sub-division of the township. But these field notes were never approved or recorded, and there appears upon the front pages of the same, as found in the land office, the following words, in red ink : “Incorrect and not recorded, B. P. R.” There is also found in the book of records of field notes, a blank space left for this township, in the margin of which there is written in pencil, the following words: 1 ‘ Left blank for the purpose of recording when the town shall be re-surveyed.” No other survey appears to have been made by the general government.
The agreed statement also shows that, in point of fact, the east and west sub-division lines of this township never were run or marked. And the same is true of the north and south lines of the three western tiers of sections, (except at section 16,) and the same is generally true of the balance of the township. But we find there is a line distinctly marked at the place where the defendant claims the location of this boundary, between sections one and two, corresponding with the calls and description contained in the field notes as returned by Lowrie. This line is 10.05 chains west of the straight line above described, but does not appear to have been run or marked south of the south line of sections one and two.
The following statutory provisions were in force at the date of these surveys :
By the act of congress, passed May 18, 1796, (Brightly’s Dig. 493, sec. 208. 1 U. S. Stat. at Large, 464, sec. 2,) it was provided, that in the survey of lands in Ohio, they “ shall be divided by north and south lines run according to the true meridian, and by others crossing them at right angles so as *273 to form townships of six miles square. * * * The corners of the townships shall be marked with progressive numbers from the beginning ; each distance of a mile between the said corners shall be distinctly marked with marks different from those of the corners. One half of the said townships, taking them alternately, shall be sub-divided into sections, containing, as nearly as may be, six hundred and forty acres each, by running through the same, each way,, parallel lines at the end of every two miles ; and by marking a corner on each of said lines at the end of every mile ;. the sections shall be numbered respectively, beginning with number one, in the north-east section, and proceeding west, and east alternately, through the township, with progressive numbers, until the thirty-sixth is completed. And it shall be the duty of the deputy surveyors, respectively, to cause to be marked on a tree near each corner made as aforesaid, and within the section, the number of such section, and over it the number of the township in which such section may be; and the said deputies shall carefully note, in their respective-field books, the names of the corner trees so marked, and the-numbers so made. * * * * All lines shall be plainly marked upon trees and measured with chains, &c. Every surveyor shall note in his field book the true situation of all-mines, salt licks, salt springs and mill sites, which shall come-to his knowledge ; all water courses over, which the lines he-runs shall pass ; and also the quality of the lands. These field books shall be returned to the surveyor general, who shall therefrom cause a description of the whole lands surveyed to be made and transmitted to the officers who may superintend the sales; he shall cause a fair plat to be made-of the townships and fractional parts of townships contained in the said lands, describing the sub-divisions thereof, and the marks of the corners. This plat shall be recorded in books to be kept for that purpose ; á copy thereof shall be kept open at the surveyor general’s office for public information; and other copies sent to the places of sale and to the secretary of the treasury.”
On the 11th Feb., 1805, another act was passed, (Bright *274 ly’s Dig. 494, sec. 211, 2 U. S. Stat. at Large, 313, see. 1), by which it was provided, that the surveyor general should cause the lands which had been surveyed and sub-divided under the provisions of the foregoing act, “to be sub-divided into sections, by running straight lines from the mile corners thus marked, to the opposite corresponding corners, and by marking on each of said lines intermediate corners as nearly as possible equidistant from the comers of the sections on the same.”
By the same act, (Brightly’s Dig. 466, sec. 41, 2 U. S. Stat. 313, sec. 2), it was provided that “the boundaries and contents of the several sections, half sections and quarter sections of the public lands of the United States, shall be ascertained in accordance with the following principles, any act or acts to the contrary notwithstanding :
“ 1st. All corners marked on the surveys returned by the surveyor general, &c., shall be established as the proper corners of sections, or sub-divisions of sections, which they were intended to designate; and the corners of half and quarter sections not marked on the said surveys shall be placed as nearly as possible equidistant from those two cornel’s which stand on the same line.
“ 2d. The boundary lines actually run and marked in the surveys returned by the surveyor general, &c., shall be established as the proper boundary lines of the sections, or subdivisions for which they were intended, and the length of such lines, as returned by either of the surveyors aforesaid, shall be held and considered as the true length thereof. And the boundary lines which shall not have been actually run and marked as aforesaid, shall be ascertained by running straight lines from the established corners to the opposite corresponding corners, &c.
“ 3d. Each section, or sub-division of sectioiz, the contents whereof shall have been, or by virtue of the first section of this act shall be, returned by the surveyor general, &c., shall be held and considered as containing the exact quantity expressed in such return or returns ; and the half sections and quarter sectiozzs, the contents whereof shall not *275 have been thus returned, shall be considered as containing the one-half or the one-fourth part respectively of the returned contents of the section of which they make a part.”
Upon the foregoing statement of facts we are of opinion that the line between sections one and two was not established by the survey made by Lowrie ; that the sub-division of the township into sections, as made by him, should be treated as though it had not been made ; and that the field-notes, as returned by him to the office of the surveyor general of the district, have no force or validity whatever.
Annexed, however, to the bill of exceptions, is a copy of a plat of this township, found in the office of the surveyor general, and from which the sales were made at the laud office. The lines and distances noted on the plat correspond with the field-notes returned by Lowrie.
By inspection of the plat, the division line between sections one and two appears to be part of a straight line drawn from the corner of sections one and two, as fixed by Carpenter, on the north exterior line of the township, to the corresponding corner on the south of sections thirty-five and thirty-six. It also appears that this line crosses the river twice, whereas, in fact, a straight line between those points passes east of the river.
It also appears from the plat that the fractional parts of section two (formed by the course of the river) correspond in quantities with the fractions selected by Allen, as agent for the State, in list of selections No. 5, the fraction south of the river containing 158.49 acres. This fraction embraces lands in the north-east as well as in the south-east quarter of the section, while only that part of the fraction lying in the south-east quarter was conveyed by the State to the Stuarts, and afterwards by them to the plaintiff below, as containing the same quantity, to wit: 158.49 acres, and described as the s. e. frac, of s. e. | of sec. 2, &c. Whether the field-notes returned by Lowrie indicated these fractional quantities we are not informed. It appears, however, from the record that, with the exception of quantity, the section line located according to the claim of either party equally fills *276 the description in the chain of title, to wit: the fraction south of the river: but we are not advised which location, or that either of them, will verify the quantity called for in the deed or in the selection.
We are satisfied, however, that the plat was drawn from the field-notes of Lowrie. Upon this state of facts the plaintiff in error insists upon the following proposition: “If this map was used to furnish the descriptions of the grant, by these descriptions must the thing granted be described, whether the survey and map were accurate or inaccurate ; whether the surveyor did his duty or did it not. This was the only map in existence at the time of the grant, and of course the only, one known to the contracting parties, viz : the United States and the State of Ohio.”
That the map furnished the description, so far as quantity is concerned, may be true ; but that the description of boundaries was furnished by the map does not appear. In the description of boundaries no reference is made to the-plat, nor does the plat refer to the field-notes. The boundary at the place in controversy is described as a section line. And as boundary controls quantity, in matters of description, we are brought back to the question, Where is the section line ? It had not been located or established at that time. This fact must have been known to the contracting parties. It must also be presumed that they knew the law to be, in such a case, that the section line must be ascertained by running a straight line between opposite corners on the exterior township lines. These corners had been established by Carpenter in 1820, and we must therefore conclude that the parties intended that the line should be ascertained in the manner prescribed by the act of congress of 1805, and that they did not intend to adopt or ratify the rejected field notes returned by Lowrie.
Judgment affirmed.
Welch, C. J., and White, Day and West, JJ., concurred.